IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| BRIAN HUTCHINSON,<br><br>            Plaintiff,<br><br>    vs.<br><br>CITY OF THOMPSON FALLS,<br><br>            Defendant. | CV 19–195–M–DLC<br><br><br><br>ORDER |

Plaintiff Brian Hutchinson ("Hutchinson") sued Defendant City of Thompson Falls ("the City") for violating federal and state antidiscrimination laws after it fired him from his job as a Police Patrol Officer.  (*See generally* Doc. 4.) Discovery closed on October 19, 2020 (Doc. 12), and the City argues that the undisputed factual record shows that Hutchinson cannot establish prima facie claims under either the Americans with Disabilities Act ("ADA") or the Montana Human Rights Act ("MHRA").  (Doc. 18 at 5.)  Specifically, the City contends that Hutchinson is not a "qualified individual" within the meaning of the ADA or MHRA, and thus does not fall within the scope of the statutes' protections.  (*Id.* at 18.)  Consequently, the City moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56.  (Doc. 17.)

For the following reasons, the Court denies the City's motion on the briefs and vacates the hearing scheduled on January 8, 2021.

## BACKGROUND

Hutchinson worked for the City as a Police Patrol Officer beginning in 2009. (Doc. 27 at 1.)  On March 1, 2017, Hutchinson injured his back on the job and initiated medical treatment from Dr. Paul B. Haynes ("Dr. Haynes").  (*Id.* at 2.) Initially, Dr. Haynes predicted that Hutchinson's injury would prevent him from working "for . . . several weeks."  (*Id.*)  However, from March 29, 2017 until the end of August 2017, Dr. Haynes indicated on Medical Status Forms ("Status Forms") provided in relation to Hutchinson's workers' compensation claim that Hutchinson was "[n]ot [r]eleased to [w]ork."  (*Id.* at 3–4; *see also* Docs. 19-5, 19-6.)

Then, on August 28, 2017, the City sent Hutchinson a letter offering him "temporary transitional work" on sedentary duty; the City set out the parameters of the job in an analysis attached to the letter.  (Docs. 10-2; 10-3.)  On September 13, 2017, Dr. Haynes advised that Hutchinson could work on "[m]odified [d]uty" for two hours per day, beginning September 25, 2017.  (Docs. 19-8; 27 at 5.) Consequently, on October 2, 2017, Hutchinson accepted the City's offer of temporary, light duty work while he continued to recover.  (Docs. 27 at 5; 10 at 3.) He agreed that the position as it was described in the City's job analysis constituted a reasonable accommodation for his injury; however, within two weeks of beginning work, Hutchinson complained that his workspace had been rearranged

on the "Chief's prerogative." (Docs. 27 at 5; 27-2 at 7–8.) Additionally, and notwithstanding the modification laid out in the job analysis that stated "[c]o-workers are available to provide assistance at all times," another office worker filed a complaint against Hutchinson after he asked her to retrieve a ream of paper for him so that he could avoid the stairs. (Docs. 10-3 at 1; 27-2 at 8–9.) Then, on November 3, 2017, Hutchinson reinjured his back as he walked up stairs leaving work. (Doc. 27 at 6.) Three days later, Dr. Haynes removed him from the light duty position, and Hutchinson did not return to work for the City in any capacity thereafter. (*Id.* at 7; *see also* Doc. 10 at 4.)

Dr. Haynes continued to treat Hutchinson's pain pharmacologically, and through December 2017, Hutchinson maintained a regimen of physical therapy. (Doc. 27 at 8.) On February 28, 2018, at City Mayor Mark Sheets' ("Mayor Sheets") behest, Dr. Haynes completed a "Medical Inquiry Form in Response to an Accommodation Request" ("Medical Inquiry Form"). (Docs. 27 at 9; 19-10.) To questions posed on the Medical Inquiry Form designed to "determine whether an employee has a disability," Dr. Haynes responded that Hutchinson had a "physical or mental impairment," and that Hutchinson was "unable to work at present job [Police Patrol Officer] due to back pain." (*Id.*)

Nevertheless, Dr. Haynes suggested that a possible accommodation could improve Hutchinson's job performance: "Sit-down jobs for four hours a day [for]

two weeks and then increase hours as able." (*Id.* at 11.)  Dr. Haynes never released

Hutchinson to work in a position meeting those conditions, though he could not

recall if the City ever presented a job that fit the bill after he completed the

Medical Inquiry Form.  (Docs. 27 at 11–12; 27-3 at 10.)  Indeed, no facts in the

record indicate that the City did.  If the City had presented such a job, however, Dr.

Haynes testified that he would have discussed it with Hutchinson and assessed

whether it was something Hutchinson could do.  (*Id.*; *see also* Doc. 27-3 at 8.)

After Dr. Haynes submitted the Medical Inquiry Form, Hutchinson met with

Mayor Sheets and the City Attorney on March 5, 2018 to discuss possible

accommodations.  (Doc. 27 at 13.)  While Hutchinson did not come to the meeting

with ideas, the City suggested that he could exhaust his accrued vacation leave,

thereby allowing him to use his employer-sponsored health insurance.  (*Id.* at 14.)

Three days later, Mayor Sheets sent a letter to Hutchinson conveying his belief

that, after considering the Medical Inquiry Form, *inter alia*, "the only reasonable

accommodation possible is for [Hutchinson] to use [his] accumulated leave[.]"

(Docs. 27 at 15; 19-12.)  Mayor Sheets concluded the letter by asking Hutchinson

to respond whether he accepted "this temporary reasonable accommodation."

(Doc. 19-2.)  On March 14, 2018, Hutchinson accepted the City's proposal.  (Doc.

27 at 15.)

Several weeks before Hutchinson exhausted his vacation leave, Mayor

Sheets arranged another meeting to "reevaluate [his] condition in regards to

returning to work as a Police Officer" and to "discuss if an accommodation can be

made for [him] to return to work if [his] condition has changed per input from [his]

Doctor." (Doc. 19-15.)  Accordingly, Hutchinson met with Mayor Sheets on May

7, 2018.  (Docs. 19-2 at 18; 27 at 18.)  There, Mayor Sheets suggested he take

leave-without-pay status pursuant to the City's policies as a potential

accommodation.  (Doc. 27 at 20.)  The parties dispute whether Mayor Sheets told

Hutchinson that the City would grant his request to take leave-without-pay status if

he requested it.  (*Id.*)  Nevertheless, on May 9, 2018, Hutchinson requested that the

City place him on leave-without-pay status once he exhausted his accrued vacation

leave, stating that his request "compli[ed] with [Mayor Sheets'] instructions to do

so, as per [the] meeting on 05/07/2018." (Doc. 10-10 at 2.)  The same day,

Hutchinson exhausted his accumulated vacation leave.  (Doc. 19-13.)

On May 16, 2020, Mayor Sheets received notice that—in the context of

Hutchinson's ongoing workers' compensation claim—Dr. Haynes had opined that

Hutchinson had reached "maximum medical improvement."  (Doc. 27 at 25.)

Specifically, the workers' compensation adjuster had denied coverage for the

physical therapy treatments Dr. Haynes recommended since January 2018, and

Hutchinson's workers' compensation attorney sought to know whether Hutchinson

had "reached a point in the healing process when further material functional improvement would not be reasonable (sic) expected from *primary medical services*." (Doc. 27-7 (emphasis added).) Similarly, Dr. Haynes testified that he "wanted more physical therapy from the workmen's comp area. [Dr. Haynes and Hutchinson] had tried for . . . five or six months, [but] they [the City's workers' compensation adjuster] didn't think it was necessary." (Doc. 27-3 at 2–3.)

Mayor Sheets sent a letter a letter to Hutchinson on May 22, 2018, asking him to meet to again discuss possible reasonable accommodations; ultimately the parties agreed to convene on June 11, 2018. (Docs. 10 at 6; 10-11 at 2; 27 at 25.) In his letter, Mayor Sheets asked Hutchinson to bring a completed Medical Inquiry Form to the meeting; however, on June 11, Hutchinson explained that the clinic had misplaced the paperwork, so he could not provide it to the City at that time. (Doc. 19-19 at 2.) In any event, Hutchinson clarified that Dr. Haynes' "maximum medical treatment" evaluation related only to his condition "barring any continued treatment." (*Id.*) Hutchinson went on to say that, now that the City's workers' compensation adjuster was "no longer in the picture," he could continue to pursue physical therapy treatments or "any sort of treatment that might actually show improvement." (*Id.*) By pursuing more treatment, Hutchinson said that he could "start hopefully getting some forward progress." (*Id.*)

Notwithstanding Hutchinson's optimism, he agreed that, as of the date of the June 11 meeting, he was not able to perform the physical requirements of the only open City job.  (Doc. 27 at 29, 32.)  When Mayor Sheets responded that he "[didn't] think that there's a reasonable accommodation that . . . we can do, and we have . . . already, you know, allowed you to use [accrued vacation] leave," Hutchinson explained his understanding that his leave-without-pay status would be effective for "90 or 120 days."  (Doc. 19-19 at 3.)  Mayor Sheets did not disagree, but simply asserted that leave-without-pay status was "up to [the] discretion . . . of the [C]ity[,]" and went on to point out technical deficiencies in Hutchinson's request letter.  (*Id.*)

He then handed Hutchinson a letter that both denied Hutchinson's request for leave-without-pay status and terminated his employment with the City.  (Doc. 19-22.)  The City Attorney summarized that "leave-without-pay status is a discretionary decision, and Mark [Mayor Sheets] has decided that he does not want to grant that status because it would be an undue hardship on the City."  (Doc. 19-19 at 4.)  The letter further stated that "after discussion with [Hutchinson] and review of [his] medical status, [the City] [does] not believe that there are any other accommodations which can be made[.]"  (Doc. 19-22.)

After his termination, Hutchinson unsuccessfully looked for part-time, sedentary jobs via the Montana Job Service.  (Docs. 27 at 48; 27-2 at 21–22.)  And,

without the City's health insurance coverage, Hutchinson could not afford to pursue physical therapy treatments after the City fired him. (Doc. 27 at 48–49.) The City, meanwhile, made two temporary police officers permanent officers and posted two positions for clerical work. (*Id.* at 48.) Hutchinson testified that he could have performed either clerical position, despite his injury. (*Id.* at 48–49.)

On August 23, 2019, Hutchinson sued the City for failing to accommodate his disability and terminating his employment on a discriminatory basis in violation of state and federal law. (*See generally* Doc. 4.) The City moved for summary judgment on September 29, 2020, arguing that Hutchinson cannot establish prima facie accommodation and discrimination claims under either the ADA or MHRA, because he is not a "qualified individual." (Docs. 17; 18 at 6.)

## LEGAL STANDARD

Summary judgment is proper if movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of some factual dispute is not enough to survive summary judgment; the fact must be material, and the dispute must be genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Substantive law identifies which facts are material. *Id.* at 48. That is, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Further, a

dispute may only be characterized as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

It follows, then, that there is no genuine factual dispute where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Still, "[o]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## DISCUSSION

Federal and Montana law[1] prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).

---

[1] Hutchinson bases his claims on both the ADA, 42 U.S.C. § 12101 *et seq.*, and the MHRA, Mont. Code Ann. § 49–2–303 *et seq.* (Doc. 4.) "When construing provisions of the MHRA, [Montana courts] look to guidance from federal anti-discrimination law under the Americans with Disabilities Act (ADA)." *Alexander v. Mont. Dev. Ctr.*, 430 P.3d 90, 94 (Mont. 2018). That is, and as former Montana Supreme Court Justice Patricia O. Cotter explained:

> [The MHRA] differs from the ADA in [only] one respect. Under the ADA, the employee must make an initial showing that the accommodation "seems reasonable on its face, *i.e.*, ordinarily or in the run of cases," or that "special circumstances warrant a finding that . . . the requested 'accommodation' is 'reasonable' on the particular facts."

The parties agree that for his claims to survive summary judgment, Hutchinson must make a prima facie showing that: "(1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of his disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (citations and alterations in original omitted). The City concedes that Hutchinson can show that he is disabled within the meaning of the ADA and that he suffered an adverse employment action because of his disability. (Docs. 18 at 18; 26 at 17.) The City contends, however, that Hutchinson cannot demonstrate that he is a qualified individual within the meaning of the ADA. (Doc. 18 at 18.) The main thrust of the City's argument is that Hutchinson's request for leave-without-pay constitutes an unreasonable accommodation and no other accommodations existed that would have allowed him to resume work. (Doc. 18 at 22–29.)

The Court, having followed "well-established ADA analysis," concludes that summary judgment is inappropriate. *See Samper*, 675 F.3d at 1240. First, a

---

*McDonald v. Mont. Dept. of Envtl. Quality*, 214 P.3d 749, 765 n.1 (Cotter, J., concurring and dissenting) (Mont. 2009). The MHRA, in contrast, places no such initial burden on the employee. *Id.* at 765. Thus, if Hutchinson shows that he can establish his discrimination claims under the ADA, his claims under the MHRA's analogues survive, too. Accordingly, the Court agrees with the parties that, for purposes of the issue raised by the instant motion, the ADA and the MHRA "are functionally identical" (Doc. 18 at 17) and conducts its analysis through the lens of the ADA.

reasonable jury could find that Hutchinson satisfies the prerequisites of the job.

Second, a genuine factual dispute remains as to whether leave-without-pay status

was a reasonable accommodation that would have allowed Hutchinson to perform

the essential functions of a Police Patrol Officer or a reassignment position.  And

finally, summary judgment is inappropriate because a reasonable jury could

conclude that the City failed to engage in the interactive process in good faith.

## I.   The factual record does not support the legal conclusion that Hutchinson is not a qualified individual.

The ADA protects only "qualified individuals" from employment disability

discrimination.  42 U.S.C. § 12112(a); *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123,

1227 (9th Cir. 2020).  An individual is "qualified" so long as he is able to perform

the essential functions of the position[2] "*with* or without *reasonable*

*accommodation*." 42 U.S.C. § 12111(8)[3] (emphasis added).  The Ninth Circuit

recently reaffirmed its adoption of the following "two-step qualification inquiry"

for determining whether an individual is qualified under the ADA:

> We first determine whether the individual satisfies the prerequisites of
> the job; more specifically, whether "the individual satisfies the requisite
> skill, experience, education and other job-related requirements of the
> employment position such individual holds or desires."  At step two,

---

[2] The ADA's definition of a qualified individual also "includes individuals who could perform
the essential functions of a *reassignment position*, with or without reasonable accommodation,
*even if they cannot perform the essential functions of the current position*."  *Hutton v. Elf
Atochem N. Am., Inc.*, 273 F.3d 884, 892 (9th Cir. 2001) (citation omitted) (emphasis added).
[3] Likewise, under the MHRA, an employee is "qualified" if he "can perform the essential
functions of the job with or without a reasonable accommodation . . . ."  *McDonald*, 214 P.3d at
758–59 (citing Admin. R. Mont. 24.9.606(2)).

we determine whether, "with or without reasonable accommodation," the individual is "able to perform the essential functions of such position."

*Anthony*, 955 F.3d at 1127–28 (quoting 29 C.F.R. § 1630.2(m)).

The Court will consider each step of the inquiry in turn.

## A.      Hutchinson can show that he satisfies the prerequisites of the job.

No genuine factual dispute exists—nor is any legal argument made—on the first step of the qualified individual element, regardless of Hutchinson's admitted inability to work without accommodation at the time he was terminated.  The first step of the inquiry, "unlike the second step, contains no reference to reasonable accommodation."  *Johnson v. Bd. of Trs. of the Boundary Cty. Sch. Dist. No. 101*, 666 F.3d 561, 565 (9th Cir. 2011).  Instead, and again, the only question under the first step is whether the individual "satisfies the requisite skills, experience, education and other job-related requirements of the employment position [he] holds or desires[.]"  *Id.* (citing Equal Opportunity for Individuals with Disabilities, 56 Fed. Reg. 35,726, 35,735 (July 26, 1991)).  So, for example, "the first step in determining whether an accountant who is paraplegic is qualified for a certified public accountant (CPA) position is to examine the individual's credentials to determine whether the individual is a licensed CPA."  *Id.* (quoting 29 C.F.R. Pt. 1630, app. to § 1630.2(m)).

Here, Hutchinson worked as a Police Patrol Officer for nearly eight years before he suffered his disabling on-the-job injury.  (Docs. 10 at 3; 10-1.) Presumably, the City would not have hired and retained him for the better part of a decade if he did not possess "the appropriate educational background, employment experience, skills, licenses, etc."  *Cf. Anthony*, 955 F.3d at 1228.  Indeed, the City admits that it fired Hutchinson based on his disability, not because it discovered that he failed to meet some prerequisite of the job.  (*See* Docs. 19-19; 19-22; 27 at 46); *Cf. Anthony*, 955 F.3d at 1228 (first step of ADA qualified individual inquiry unsatisfied where plaintiff never possessed a bachelor's degree, an actual requirement of her position).

Taking the facts in the light most favorable to Hutchinson, his tenure with the City provides evidence from which a reasonable jury could find that he satisfies the prerequisites of the job.  That he could not perform the essential functions of the Police Patrol Officer job at the time of his termination is irrelevant to this step of the inquiry, and the Court moves on to the second.

> **B.    A triable issue of fact exists as to whether Hutchinson could perform the essential functions of the job with reasonable accommodation.**

By way of reminder, Hutchinson requested that the City place him on leave-without-pay status pursuant to Mayor Sheets' suggestion; the City, in turn, simultaneously denied the requested accommodation and fired him. (Docs. 27 at

20; 10-10 at 2; 19-22.)  The City insists that no reasonable accommodation existed at the time it fired Hutchinson that would have allowed him to perform the essential functions of his job, explaining that his request for unpaid leave was unreasonable as a matter of law.  (*Id.* at 22–29.)  In other words, the City says that it is entitled to summary judgment because Hutchinson cannot satisfy the second step of the qualified individual inquiry.  *See Anthony*, 955 F.3d at 1127–28.  But, as it did the first, the Court finds that summary judgment is inappropriate on the second step of the qualified individual inquiry.

The ADA obligates an employer to "mak[e] reasonable accommodations to the known physical or mental limitations of an *otherwise qualified* . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business."  42 U.S.C. § 12112(b)(5)(A) (emphasis added).  Here, Hutchinson can show that he is "otherwise qualified" under the ADA because, as discussed above, he satisfies the job prerequisites.  *See Johnson*, 666 F.3d at 565.  The question under the second step of the qualified individual inquiry, then, is whether, "with or without reasonable accommodation," the Hutchinson is "able to perform the essential functions of such position."  *Anthony*, 955 F.3d at 1127–28 (quoting 29 C.F.R. § 1630.2(m)).

As the statute's plain language indicates and as the City argues throughout, the ADA does not "demand action beyond the realm of the reasonable."  *US*

*Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).  Consequently, the Supreme Court has endorsed lower courts' practical burden-shifting approach to decide whether an accommodation is reasonable at the summary judgment phase.  *Id.* at 401–02; *see also Snapp v. United Transp. Union*, 889 F.3d 1088, 1101–02 (9th Cir. 2018).  First, the plaintiff employee "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases."  *Id.* at 401–02. After the plaintiff employee makes this showing, the burden shifts to the defendant employer to "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances."  *Id.* at 402.  The question of undue hardship, however, is not at issue in the instant motion, as the City contends solely that Hutchinson's requested accommodation is unreasonable from the outset.

The City does not dispute that leave-without-pay status is facially reasonable, and the Court agrees.  Indeed, while the realm of reasonable accommodation is not without bounds, it is expansive and includes "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position[.]"  42 U.S.C. § 12111(9)(B); 20 C.F.R. § 1630.2(o)(2)(ii).  Additionally, and relevant here, "where a leave of absence would reasonably accommodate an employee's disability and permit him, upon his return, to perform the essential functions of the job, that employee is otherwise qualified under the ADA." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135–36 (9th Cir. 2001).

Furthermore, "[t]he ADA does not require an employee to show that a leave of absence is certain or even likely to be successful to prove that it is a reasonable accommodation," only that it could plausibly enable him to adequately perform the job. *Id.* at 1136 (citing *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir. 1989)). In other words, no one disputes that Hutchinson can show that a leave of absence, or leave-without-pay status, "seems reasonable on its face." *See Barnett*, 535 U.S. at 401–02.

Instead, the City points to Hutchinson's failure to specify the temporal scope of his leave-without-pay status to characterize his requested accommodation as "an *indefinite* leave of absence." (Doc. 18 at 23 (emphasis added).) It goes on to cite a litany of cases standing for the proposition that "[t]he ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence." *See, e.g., Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998). The City's reliance on these authorities, however, is problematic when applied to the facts of this case—at least at the summary judgment phase.

Unlike the situation in *Hill*, for example, information exists in the record about the course of treatment Hutchinson would pursue if the City granted him leave-without-pay status. *Cf. Hill v. City of Phoenix*, 162 F.Supp.3d 918, 926–27 (N. Dist. Ariz. 2016). Specifically, Hutchinson explained at the June 11, 2018

meeting—a meeting with the advertised purpose to discuss possible accommodations—that he planned to resume physical therapy treatments during his leave and was optimistic that he could "start hopefully getting some forward progress." (Doc. 19-19 at 2.) Dr. Haynes confirmed that physical therapy treatments could prove beneficial but lamented that coverage for such therapies had been denied by the workers' compensation adjuster. (Doc. 27-3 at 2–3.) That Hutchinson did not pursue physical therapy after the City fired him is irrelevant, because, as he explained, he could not afford treatments without the City's health insurance coverage. (Doc. 27 at 48–49.) Thus, it is reasonable to conclude that Hutchinson's request for leave-without-pay would accommodate his disability by allowing him to pursue physical therapy and recover functionality. *See Humphrey*, 239 F.3d at 1136 n.13.

And, taking the facts in the light most favorable to Hutchinson, the City's convenient characterization of his request as "indefinite" strains credulity. True, Hutchinson readily admits that he failed to comply with the City's Policy Manual by omitting the beginning and ending dates of his requested leave from his May 9, 2018 letter. (Doc. 10-10 at 2.) However, at the June 11, 2018 accommodation-turned-termination meeting, Hutchinson explained his understanding that his leave-without-pay status would last only "90 or 120 days" pursuant to the Policy Manual. (Doc. 19-19 at 3.) In other words, Hutchinson unequivocally explained that he was

*not* seeking indefinite leave.  Further, nothing in the City's Policy Manual states that an employee's failure to delineate the parameters of a leave-without-pay request will result in summary denial.  (*See* Doc. 19-7 at 16.)  It is not forgotten, either, that Mayor Sheets undisputedly suggested that Hutchinson take leave-without-pay status and responded with a month of silence to an apparently fatal deficiency in his request to do so.  (Doc. 27 at 20.)  In short, a jury could conclude that Hutchinson requested a reasonable accommodation, a fixed period of leave-without-pay, which plausibly could have enabled him to adequately perform his job.  *See Humphrey*, 239 F.3d at 1136 (citing *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir. 1989)).

The Court's conclusion that summary judgment is inappropriate on the second prong of the qualified individual analysis is unchanged by the City's efforts to analogize this case to *Samper*-esque authorities.  In those cases, the undisputed facts showed employees unable to adhere to their employers' respective attendance policies, thereby rendering them unqualified as a matter of law.  In *Samper*, a hospital fired a neo-natal nurse after she demonstrated that, despite the generous accommodations it granted her, she could not comply with its attendance policy—an essential function of the job.  675 F.3d at 1236.  Similarly, in *Rogers*, another case cited by the City, a mechanic was fired in a round of planned layoffs "because of his prior absenteeism . . . ."  *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755,

757 (5th Cir. 1996).  In addition to his prior poor attendance record, the *Rogers* plaintiff, who was not disabled within the meaning of the ADA, was unavailable to work at the time he was fired because he was recovering from elective surgery—and still was recovering nearly a year afterward.  *Id.*  And, in *Gantt*, a sporting goods company fired its employee after she failed to return to work following a one-year leave of absence as required by the company's posted policy.  *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998).  Never during the *Gantt* plaintiff's leave of absence did she request to return to work or any kind of accommodation, nor did she indicate when she would be able to return.  *Id.* at 1047.

At bottom, these cases reflect plaintiffs—either with a series of reasonable accommodations extended to them (*Samper*) or with no reasonable accommodations ever requested or existent (*Rogers* and *Gantt*)—who undisputedly could not or would not adhere to their respective employers' attendance policies. In contrast, there is no showing in this case that, *with reasonable accommodation*, Hutchinson could not or would not comply with the City's attendance policies along with all the other essential functions of his job.

Additionally, the City's attempt to construe Dr. Haynes' statements on Status Forms—issued in relation to his workers' compensation claim—into evidence that Hutchinson cannot comply with attendance policies fails to eliminate

a triable issue of fact.  Indeed, the effort borders on disingenuous.  As the City

certainly understands, "[w]orkers' compensation laws are different in purpose from

the ADA and may utilize different standards for evaluating whether an individual .

. . is capable of working."  *EEOC Enforcement Guidance: Workers' Compensation

and the ADA*, EEOC Compl. Man. (CCH), § 902, Vol. II at 6905 (Sept. 3, 1996).

As such, a determination in the workers' compensation context as to an employee's

"permanent disability" or "total disability" is "never dispositive regarding an

individual's ability to return to work" under the ADA.  *Id.*  True, the employer may

"find it helpful" to seek information from the employee's physician, but the ADA

places the burden of responsibility on the employer—not the doctor—for deciding

whether a disabled employee can return to work.  *Id.*

Moreover, even if Dr. Haynes was responsible for determining whether

Hutchinson could return to work, he did not, as the City suggests, "entirely

preclude[] Mr. Hutchinson from any work at the City following his . . . injury, up

to and including the date the City terminated his employment."  (*See* Doc. 28 at 5.)

Indeed, on the February 28, 2018 Medical Inquiry Form, Dr. Haynes posited that

the City could place Hutchinson in a sit-down job for four hours a day, with hours

increasing as he was able.  (Doc. 27 at 11.)  While the City tries to make hay out of

Dr. Haynes' testimony that he never "released" Hutchinson to a sedentary position

that fit that description, nothing in the record suggests that the City ever presented

such a job to Hutchinson or Dr. Haynes to review.  (Docs. 27 at 11–12; 27-3 at 10.)
If it had, Dr. Haynes explained that he would have discussed the potential job with
Hutchinson and assessed whether it would work (*Id.*; *see also* Doc. 27-3 at 8)—the
precise course he took in September 2017 when he "released" Hutchinson to the
temporary transitional position (Docs. 10-2; 10-3;19-8; 27 at 5; 10 at 3).

In sum, the Court finds the City's arguments related to *Samper* and Dr.
Haynes' workers' compensation evaluations fail to undercut Hutchinson's prima
facie showing on the second step of the qualified individual inquiry.  That is, a
reasonable jury could conclude that Hutchinson could perform the essential
functions of the job with a reasonable accommodation—leave-without-pay status.
Thus, the City is not entitled to judgment as a matter of law on the second step of
the qualified individual inquiry.  *See Anderson*, 477 U.S. at 248.

## II.    A genuine factual dispute exists as to whether the City engaged in the interactive process in good faith.

The City hedges its motion for summary judgment on the qualified
individual inquiry by contending that it cannot be held liable for its failure to grant
him leave-without-pay status, even if it does constitute a reasonable
accommodation that would have allowed him to perform the essential functions of
his job.  Specifically, it blames Hutchinson for the breakdown in the interactive
process.  (Doc. 18 at 19–22.)  That is, even if a jury could find Hutchinson's
request for unpaid leave reasonable, the City says it undisputedly acted in good

faith while Hutchinson bears responsibility for the collapse in their communications, thereby relieving the City of its duty to accommodate. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)) ("Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown [in the interactive process].").  The Court is unpersuaded.

The ADA's reasonable accommodation requirement "seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the . . . workplace." *Barnett*, 535 U.S. at 401.  Consequently, the Ninth Circuit has held that an employer has a mandatory obligation "to engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations, which can include reassignment." *Anthony*, 955 F.3d at 1134 (internal quotation marks and citation omitted).  This interactive process "requires: (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *United States E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010) (citation omitted).

Furthermore, an employer's obligation to engage in the interactive process "continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed." *Id.* at 1111 (citation omitted). The ongoing nature of the obligation "encourages employers to seek to find accommodations that really work," and "avoids the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective." *Id.* (citation and alterations omitted). Indeed, so important is the employer's obligation that it "cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process." *Anthony*, 955 F.3d at 1134.

Here, the facts reveal that the City *and* Hutchinson did engage in an interactive process. After Hutchinson suffered his disabling injury, the parties exchanged multiple letters and met on at least three documented occasions to discuss possible accommodations. However, it is equally clear that the process broke down. The City blames Hutchinson for his failure to "suggest[] a single accommodation" after he became disabled (Doc. 18 at 20), and insinuates that the collapse was complete when he "cancel[ed]" the June 2018 meeting as it was originally set and then failed to bring a completed Medical Inquiry Form to the meeting when it was reset (*see* Doc. 27 at 26–27). For his part, Hutchinson points

to the final June 11, 2018 meeting, ostensibly scheduled for the purpose of discussing accommodation, to which Mayor Sheets brought a pre-drafted and signed termination letter, as the "most egregious example of the City's . . . failure to engage in the interactive process." (Doc. 26 at 26.)

As neither the ADA nor the implementing regulations assign responsibility for when the interactive process fails, as it undisputedly did here, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck*, 75 F.3d at 1135. For example, "a party that fails to communicate, by way of initiation or response, may [] be acting in bad faith." *Id.* Similarly, "[a] party that obstructs or delays the interactive process is not acting in good faith." *Id.* At bottom, "[t]he determination must be made in light of the circumstances surrounding a given case." *Id.* at 1136.

Applying the concepts of good faith and reasonable efforts to the facts of this case, the Court finds that a genuine dispute exists as to whether the City bears responsibility for the breakdown of the interactive process. Specifically, sometime between the May 7, 2018 meeting—where Mayor Sheets suggested that Hutchinson take leave-without-pay status as a potential accommodation—and the June 11, 2018 meeting—where Mayor Sheets brought a signed termination letter to a discussion he represented as just another to consider accommodations—the

City's position as it related to Hutchinson's employment future fundamentally

changed.  Notably, nothing in the record demonstrates that Hutchinson knew, nor

that the City made him aware, that their dynamic had shifted.  Instead, the only

communication between the City and Hutchinson was a letter from Mayor Sheets

on May 22, 2018, wherein he asked Hutchinson to bring a completed Medical

Inquiry Form to their upcoming meeting.  Glaringly absent from the letter was any

indication that Hutchinson's request for the accommodation Mayor Sheets

suggested was somehow fatally deficient or that he would be presented with a

letter of termination.  (*See* Doc. 10-11.)  Thus, a reasonable jury could conclude

that the City acted in bad faith when it: suggested Hutchinson request leave-

without-pay status as an accommodation; wholly failed to communicate with him

for a month after he did so despite an allegedly fatal deficiency; and terminated

him at a meeting it branded "to discuss any reasonable accommodation."  *See*

*Beck*, 75 F.3d at 1135.

Whether or not Hutchinson came to meetings with the City carrying original

ideas for possible accommodations does not extinguish the triable issue of fact on

this point.  *See* 29 C.F.R. pt. 1630, app. ("[T]he individual needing the

accommodation may not know enough about . . . the exact nature of the work site

to suggest an appropriate accommodation.").  Hutchinson may not have generated

his own ideas for possible accommodations, but it is clear why he did not: he

agreed to each of his employer's three proposals.  (Docs. 27 at 5, 15; 10-10 at 2.)
The City points to no authority to suggest that a disabled employee bears
responsibility for the breakdown in the interactive process where he accepts each
of his employer's suggested accommodations.  And that the City granted two of
the accommodations it proposed does not act to extinguish its obligation to engage
in the interactive process after those accommodations lost their effect.  *See UPS*
*Supply Chain Sols.*, 620 F.3d at 1111 (An employer's obligation to engage in the
interactive process "continues . . . where the employer is aware that the initial
accommodation is failing and further accommodation is needed.").

Similarly, the Court is unconvinced that Hutchinson's failure to bring a
completed Medical Inquiry Form to the June 11, 2018 meeting pursuant to Mayor
Sheets' request eliminates the factual dispute.  *See Beck,* 75 F.3d at 1135–3629; 29
C.F.R. pt. 1630, app. (The cause of the breakdown might be missing information.).
While Hutchinson admittedly failed to timely comply with Mayor Sheets' request,
he explained that the circumstances were out of his control and assured that he
would provide the Medical Inquiry Form to the City as soon as his doctor's office
gave it to him.  (Doc. 19-19 at 2.)  Additionally, he explained that Dr. Haynes'
recent "maximum medical improvement" assessment was solely in relation to his
workers' compensation claim, and that he was hopeful he could continue with
therapies that "might actually show improvement" without denials from workers'

compensation.  (*Id.*)  Under these circumstances, the Court is unpersuaded that Hutchinson's failure to provide the Medical Inquiry Form at the June 11, 2018 meeting amounted to "obstruct[ion]" of the interactive process.  *Cf. Beck*, 75 F.3d at 1135.  Likewise, that Hutchinson asked to reschedule the June meeting due to his back pain cannot be fairly characterized as a bad faith "cancel[lation]" intended delay their communications.  *Id.*

Thus, because the Court concludes that a triable factual dispute exists as it relates to the party responsible for the breakdown of the interactive process, summary judgment is inappropriate even without reaching the issue of whether Hutchinson could have performed the essential job functions with reasonable accommodation.  *Anthony*, 955 F.3d at 1134.

## CONCLUSION

A reasonable jury could conclude that: (1) Hutchinson satisfies the prerequisites of the job; and (2) a reasonable accommodation existed when he was fired that could have allowed him to perform the essential functions of a position with the City.  Thus, the City is not entitled to judgment as a matter of law on the qualified individual element.  Furthermore, summary judgment is inappropriate because a genuine factual dispute exists as to whether the City engaged in the interactive process in good faith.

### ORDER

For the foregoing reasons, IT IS ORDERED that the City's motion for summary judgment (Doc. 17) is DENIED.

IT IS FURTHER ORDERED that the oral argument set for January 8, 2021 (*see* Doc. 30) is VACATED as MOOT.

Dated this 16th day of December, 2020.

Dana L. Christensen, District Judge
United States District Court